# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

STEPHEN D. FREEMAN,            :
LORRAINE A. FAIRCHILD,       :
                                :
       Plaintiffs,           :
                                :    Civil Action No.:    02-0386 (RMU)
      v.                   :
                                :    Document Nos.:    55, 56
ALLEN P. FALLIN *et al.*,        :
                                :
       Defendants         :

## MEMORANDUM OPINION

### GRANTING THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING THE PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

## I.   INTRODUCTION

This *Bivens*[1] action comes before the court on the defendants' motion for summary

judgment and the plaintiffs' motion for partial summary judgment, both brought pursuant to

Federal Rule of Civil Procedure 56(c).  The plaintiffs, Stephen Freeman and Lorraine Fairchild,

are former criminal investigators with the Office of the Inspector General ("OIG") of the United

States Environmental Protection Agency ("EPA").  The defendants, sued in their individual

capacities, are former OIG Assistant Inspector General for Investigations Allan Fallin, OIG

Deputy Assistant Inspector General for Investigations Emmett Dashiell Jr., OIG Assistant

Inspector General for Management John Jones, OIG Counsel to the Inspector General Mark

Bialek, and Department of Defense Criminal Investigator Arthur Hymons.  The plaintiffs allege

that the defendants violated the plaintiffs' rights under the Fourth Amendment of the U.S.

Constitution by "using a warrantless drug test to gather evidence for a criminal investigation[.]"

---

[1] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 389 (1971).

1

Am. Compl. ¶¶ 37, 43, 49.  Because the warrantless drug tests conducted by the defendants

began as a constitutional "special needs" test,[2] the defendants did not violate a clearly established

right of the plaintiffs.  For this reason, the defendants are entitled to qualified immunity and the

court grants the defendants' motion for summary judgment and denies the plaintiffs' motion for

partial summary judgment.


## II.    BACKGROUND

### A.    Factual Background

From 1999 to 2000, both plaintiffs worked as criminal investigators for OIG, with

plaintiff Freeman assigned to the San Francisco office and plaintiff Fairchild working in the

District of Columbia office.  Compl. ¶¶ 3-4, 10-11.  As criminal investigators engaged in law

enforcement and authorized to carry firearms, both plaintiffs were subject to random drug

urinalysis testing by the OIG under the EPA's Drug Free Workplace Plan ("DFWP").  Defs.'

Mot. at 3; Pls.' Stmt. of Genuine Issues ("Pls.' Stmt.") ¶ 1; Am. Compl. ¶ 12.

Under this program, Linda Wallace, the Director of Operations, Labor, and Employee

Relations for the EPA, requests monthly that the database manager for the EPA's personnel

system compile a random list of employees for drug testing.  Defs.' Mot., Ex. 2 ("Wallace

Decl.") ¶ 12.  After the database manager compiles the list, Wallace informs the Component

Drug Program Coordinators ("CDPC") for each office in which employees are selected for

testing.  Defs.' Mot. at 4.

---

[2]    Justice Blackmun first identified a "special needs" exception to the Fourth Amendment's
probable cause and warrant requirement "in those exceptional circumstances in which
special needs, beyond the normal need for law enforcement, make the warrant and
probable-cause requirement impracticable."  *New Jersey v. T.L.O.*, 469 U.S. 325, 351
(1985) (Blackmun, J., concurring).

After the local EPA office prepares logistically for the drug test, the selected employee is notified of the drug test and directed to report. *Id.* If the employee is not working in the office on that date, the drug test is scheduled for a date in the future when the employee will be in the office and available for testing. *Id.*

### 1.   Plaintiff Lorraine Fairchild

On January 10, 2000, plaintiff Fairchild was randomly selected for a drug test pursuant to the DFWP. Am. Compl. ¶ 14. Because Fairchild was not in the office at the time, her drug test was scheduled for February 28, 2000. Defs.' Mot. at 5; Pls.' Stmt. ¶ 5. John Jones, the CDPC for the OIG informed Fairchild upon her return to work on February 28, of the scheduled drug urinalysis test. Defs.' Stmt. ¶ 8; Pls.' Stmt. ¶ 8. The parties do not dispute that the plaintiff became "stressed out" that she would not pass the drug test. Pls.' Stmt. ¶ 9; Defs.' Stmt. ¶ 9. The plaintiff attributes her concern for not passing the test to lawful prescription drugs that she was then taking. Pls.' Stmt. ¶ 10.

According to the defendants, Fairchild approached four coworkers and asked them to provide her with urine specimens for her to submit in her drug test instead of her own. Defs.' Stmt. ¶¶ 10, 11, 12, 13. The plaintiff does not dispute that two of these employees made allegations that she approached them for this purpose, but she stops short of affirming or denying the truth of the allegations. Pls.' Stmt. ¶¶ 10, 13. One of the coworkers, referred to by the parties as E.V., reported to defendant Dashiell that Fairchild had asked E.V. for a urine sample. Am. Compl. ¶ 18. Upon receiving this allegation from E.V., Dashiell notified defendant Fallin, the Assistant Inspector General for Investigations and third-line supervisor of plaintiff Fairchild. Defs.' Mot. at 10; Pls.' Mot. at 4. Together, Dashiell and Fallin informed defendant Jones of the allegation. Defs.' Mot. at 10; Pls.' Mot. at 4. Based on these allegations, Jones instructed a

laboratory technician to visually observe Fairchild giving her urine sample.  Am. Compl. ¶ 4.

On the afternoon of February 28, Fairchild reported to the testing facility and provided a urine specimen.  *Id.* ¶ 16.  Because the laboratory technician on duty failed to observe the sampling as directed by Jones, the technician discarded the sample.  *Id.*; Defs.' Mot. at 11.

According to the plaintiffs, on March 6, 2000, the Department of Defense Criminal Investigation Service assigned defendant Hymons to conduct an investigation into Fairchild's alleged actions.  Am. Compl. ¶ 20.  Defendant Dashiell briefed defendant Hymons on the status of the investigation.  *Id.*  Hymons investigated plaintiff Fairchild's conduct by interviewing several EPA employees and keeping in close contact with Jones regarding the progress of Jones' attempt to subject Fairchild to a re-testing.  *Id.* ¶ 22.

As rescheduled, Fairchild submitted a drug test on March 9, 2000.  *Id.* ¶ 25.  Laboratory personnel observed Fairchild as she submitted the urine sample.  *Id.*  This urine sample was likewise discarded after laboratory technicians determined that the sample was insufficiently small.  *Id.*  Later that same day, at a meeting between Investigator Hymons, AIG Jones, and Bialek, Jones indicated that the plaintiff was scheduled to undergo testing, and Bialek asked Hymons to "present this matter" to the U.S. Attorney.  *Id.* ¶¶ 22-24.  On March 10, 2000, Investigator Hymons allegedly briefed an assistant United States Attorney ("AUSA") for the Southern District of Maryland on the allegations against the plaintiff, and the AUSA indicated that he would make a decision regarding prosecution once the test results were available.  *Id.* ¶ 26.

On March 20, 2000, EPA personnel requested that Fairchild appear for drug testing.  As she did for the March 9 drug test, Fairchild reported to the laboratory and provided a urine sample while being monitored by laboratory personnel.  *Id.* ¶ 31.

## 2.     Plaintiff Stephen Freeman

Meanwhile, on February 8, 2000, plaintiff Freeman was randomly selected for a drug test pursuant to the DFWP.  Am. Compl. ¶ 15.  Freeman was notified of his random selection on March 13, 2000, and he provided a sample that same day without incident.  *Id.* ¶ 27; Defs.' Mot. at 14.  Unbeknownst to Freeman, because Freeman and Fairchild were allegedly engaged in a romantic relationship, and because of the allegations that Fairchild solicited EPA cohorts for urine, plaintiff Freeman was under investigation in the investigation already underway as to Fairchild.  Am. Compl. ¶¶ 20, 30, 33.

Freeman's urine sample tested negative for drugs.  On March 20, 2000 and March 24, 2000, respectively, AIG Jones allegedly informed Investigator Hymons that test results for Freeman and Fairchild were negative.  *Id.* ¶¶ 30, 32.  The plaintiffs assert that Investigator Hymons then reported the results to the AUSA, who indicated that he would not go forward with prosecution.  *Id.* ¶ 33.

## B.     Procedural History

On February 28, 2002, the plaintiffs filed a complaint alleging that the defendants violated their Fourth Amendment rights and requesting five million dollars in compensatory and punitive damages.  Specifically, the plaintiffs, then *pro se*, alleged that the defendants manipulated the EPA's random drug-testing procedures to target the plaintiffs for testing in violation of the Fourth Amendment.  Compl. ¶ 15.

## 1.     The Defendants' Motion to Dismiss

The defendants moved to dismiss for lack of subject matter jurisdiction, improper venue, insufficient service of process, and failure to state a claim on which relief may be granted.  Relevant to the instant motions, the defendants argue that they were entitled to qualified

immunity under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S.

388 (1971).  On March 24, 2003, the court denied the defendants' motion to dismiss.  The court

ruled that the plaintiffs have a Fourth Amendment right to protection against the use of agency

suspicionless drug testing procedures to gather evidence for criminal proceedings, and that this

right was clearly established at the time of the defendants' actions.  *Freeman v. Fallin*, 254 F.

Supp. 2d 52, 59-60 (2003).  In so ruling, the court noted that the "critical factor in the validity of

suspicionless testing is the non-law enforcement nature of the special need asserted as

justification."  *Id.* at 60 (citing *Ferguson v. City of Charleston*, 532 U.S. 67, 79 (2001)).

### 2.   The Defendants' Motion to Alter or Amend the Judgment

On February 26, 2004, the court denied the defendants' motion for the court to alter or

amend its judgment.  *Freeman v. Fallin*, 310 F. Supp. 2d 11 (D.D.C. 2004).  The court concluded

that there was "no intervening change of law, new evidence, or need to correct a clear error or

prevent manifest injustice that would warrant granting the defendants' motion."  *Id.* at 16 (citing

*Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (*per curiam*)).  In rendering this

ruling, the court reiterated its acceptance of the plaintiffs' allegations as true – that "[i]nstead of

following EPA policy by drawing a random sampling based on a neutral criterion, AIG Fallin . . .

chose last names beginning with the letter F, thereby ensuring that the plaintiffs would be among

those tested."  *Freeman*, 310 F. Supp. 2d at 13.

### 3.   The Plaintiffs' Amended Complaint

The plaintiffs filed an amended complaint on September 19, 2005.  Whereas the

plaintiffs' original complaint alleged that the defendants "manipulated EPA's random drug-

testing procedures," *Freeman*, 254 F. Supp. 2d at 54, through the benefit of counsel and

discovery, the plaintiffs' amended complaint alleges that the defendants' initiation of an

investigation with the U.S. Attorneys' Office into the allegations of Fairchild's misconduct eviscerated the constitutionality of the otherwise proper "special needs" drug test. Am. Compl. ¶¶ 12, 21, 34. Critically, the plaintiffs now concede that they were randomly selected for drug testing pursuant to the DFWP. *Id.* ¶ 14, 15; Pls.' Stmt. ¶ 4, 6.

The plaintiffs' change in allegations is constitutionally significant. Under their complaint, the plaintiffs alleged that the defendants' investigation triggered the plaintiffs' selection for drug testing. Now, under the amended complaint, the plaintiffs concede that they were initially selected for drug testing under established EPA procedures (that is, randomly), but claim that the subsequent investigation rendered the drug tests unconstitutional.[3]

The defendants have moved for summary judgment claiming that the constitutional effects of the subsequent investigation into the plaintiffs' alleged wrongdoing raises an as yet unanswered constitutional question and, as such, the defendants are entitled to qualified immunity. *See generally* Defs.' Mot. The plaintiffs move for partial summary judgment arguing that the defendants violated the plaintiffs' Fourth Amendment rights by subjecting them to drug testing without a warrant. *See generally* Pls.' Mot. The court now turns to the parties' motions.

---

[3]     Short of saying that the court's prior *Bivens* rulings in this case have preclusive legal effect, the plaintiffs assert that because "the court twice rejected defendants' qualified immunity claim in the context of the plaintiffs' original complaint" it is unnecessary for the court to address that claim here. Pls.' Mot. at 12, n.7. The court rejects this argument. In filing their amended complaint, the plaintiffs have altered the undisputed facts at issue in this case. Because the plaintiffs have abandoned their claims that the defendants "manipulated EPA's random drug-testing procedures," *Freeman*, 254 F. Supp. 2d at 54, which constituted a factual predicate for the court's prior rulings, the court must now revisit the defendants' qualified immunity claim. *See Bivens*, 403 U.S. 388.

### III.   ANALYSIS

#### A.   Legal Standard for a Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.*

In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993). Rather, the nonmoving party must present specific facts that would enable

a reasonable jury to find in its favor. *Greene*, 164 F.3d at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

### B.   The Court Grants the Defendants' Motion for Summary Judgment

The defendants claim that they are entitled to qualified immunity and that the constitutional question posed by this case should be resolved in their favor. Defs.' Mot. at 20-33. The defendants assert that even if they did violate a constitutional right of the plaintiffs, this right was not clearly established at the time the incident took place. *Id.* at 33-37. Thus, they assert that they are immune from this litigation. For the reasons that follow, the court rules that the defendants did violate the plaintiffs' Fourth Amendment right but that this right was not clearly established at the time the searches took place. Accordingly, the court grants the defendants' motion for summary judgment.

### 1.   Legal Standard for *Bivens* Claims and the Qualified Immunity Defense

A plaintiff may bring a civil action for money damages against a federal official in his or her individual capacity for violation of the plaintiff's constitutional rights. *Bivens*, 403 U.S. at 389. Federal officials may be entitled to a defense of qualified immunity, however. *Wilson v. Layne*, 526 U.S. 603, 614 (1999) (citing *Harlow*, 457 U.S. at 818). Qualified immunity "shield[s officials] from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* Qualified immunity "provides not simply a defense to liability, but also an entitlement not to stand trial or face the other burdens of litigation." *Farmer v. Moritsugu*, 163 F.3d 610, 613 (D.C. Cir. 1998) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

In evaluating a *Bivens* claim to which a defendant has raised the qualified immunity

defense, the court must follow a two-pronged analysis.  *Butera v. Dist. of Columbia*,[4] 235 F.3d 637, 646 (D.C. Cir. 2001) (citing *Wilson*, 526 U.S. at 609).  First, as a threshold matter, the court must determine whether the plaintiff has alleged the deprivation of an actual constitutional right. *Id.*; *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  In defining an "actual constitutional right," a court must be careful to avoid defining the right in overly general terms "lest [it] strip the qualified immunity defense of all meaning."  *Butera*, 235 F.3d at 646.  Instead, the court must identify the right with the appropriate level of specificity so as to allow officials to reasonably anticipate when their conduct may give rise to liability for damages.  *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).  Second, the court must decide whether the constitutional right was "clearly established" at the time of the defendant's action.  *Id.*  A right is "clearly established" if "the contours of that right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Id.* (quoting *Wilson*, 526 U.S. at 614-15); *Crawford-El v. Britton*, 523 U.S. 574, 591 (1998) (stating that "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct").  Although the specific action in question need not have been held unlawful by the courts, its unlawfulness in light of pre-existing law must have been apparent to the defendant.  *Butera*, 235 F.3d at 646 (quoting *Anderson*, 483 U.S. at 640).

---

[4] *Butera* involved a suit brought against state officials pursuant to 42 U.S.C. § 1983. *Butera,* 235 F.3d at 640-41.  The Supreme Court has held, however, that there is no distinction between a *Bivens* suit and a suit brought under section 1983 for purposes of immunity.  *Butz v. Economou*, 438 U.S. 478, 508 (1978); *Gray v. Poole*, 243 F.3d 572, 577 n.4 (D.C. Cir. 2001).

### 2.    The Defendants are Entitled to Qualified Immunity

In this case, the parties do not dispute that both plaintiffs were randomly selected and scheduled for drug testing pursuant to the EPA's DFWP.  Defs.' Stmt. ¶¶ 2-5; Pls.' Stmt. ¶¶ 2-5. Furthermore, the plaintiffs do not challenge the DFWP's constitutionality under the "special needs" exception of the Fourth Amendment.

After the drug tests were scheduled, but before they were administered, the defendants initiated an investigation.  Though the parties dispute the nature of that investigation, here, the court draws all factual inferences in favor the plaintiffs.  *Anderson*, 477 U.S. at 255.  Thus, for purposes of addressing this motion, the court presumes that the investigation undertaken by the defendants into whether plaintiff Fairchild engaged in evasive conduct, had a law enforcement

purpose and was criminal in nature.[5]  Under *Bivens*, therefore, the two inquiries before the court

are (1) whether the plaintiffs have alleged an actual Fourth Amendment right to protection, that

is, whether the Fourth Amendment protects against the use of an agency drug testing procedure

initiated as part of a constitutionally valid "special need" but administered during an intervening

criminal investigation, and, if so, (2) whether that right was clearly established at the time of the

defendants' actions.  *See Butera*, 235 F.3d at 646.

### a.    The Plaintiffs Have Stated a Claim Under the Fourth Amendment

In this case, the plaintiffs allege that the defendants deprived them of their Fourth

Amendment rights by subjecting them to drug testing which included a law enforcement purpose.

Am. Compl. ¶¶ 37, 43, 49.  Looking to Supreme Court precedent, the court concludes that the

---

[5]    The parties dispute the nature of the investigation.  The nature of the investigation is critical in determining the extent, if any, of the law enforcement purpose behind the search.  *City of Charleston v. Ferguson*, 532 U.S. 67 (2001).  The plaintiffs characterize the investigation as a "criminal investigation."  Pls.' Mot. at 5.  In support of this position, the plaintiffs points to E.V.'s allegations that "Fairchild possessed drug paraphernalia in her home . . . regularly used marijuana [] and . . . that [Freeman and Fairchild] were engaged in a drug trafficking scheme which supposedly involved use of EPA's inter-office mail system."  *Id.* at 15.  Furthermore, the plaintiffs point to the scope of the investigation as including "not only the allegations about evading the drug tests, but also the allegations relating to drug possession and drug trafficking," *id.* at 16, the presentment of the case to the AUSA, *id.* at 17, and defendant Hymons' belief that the allegations against Fairchild were "criminal in nature," *id.* at 16 (quoting Pls.' Mot., Ex. 8 ("Hymons Decl.") ¶ 5).  The defendants, on the other hand, point to evidence supporting their contention that the investigation was administrative, not criminal.  Defs.' Mot. at 28.  The defendants cite several officers' understandings of the character of the investigation as administrative as well as documents characterizing the investigation as administrative.  *Id.* at 28-30.  Additionally, the defendants claim the AUSA's involvement buttresses the administrative character of the investigation in that "the purpose of the contact with [the AUSA] was not for the specific purpose of seeking to prosecute plaintiff, but rather was principally oriented towards satisfy [sic] the necessary procedural steps so that Ms. Fairchild and Mr. Freeman could be interviewed as part of the investigatory process."  *Id.* at 31.  Given the evidence presented to the court, the court determines that a reasonable jury could conclude that the investigation was "criminal," "administrative," or a mix of both.  For purposes of addressing the defendants' claim of qualified immunity raised in their motion for summary judgment, the court assumes that the investigation was criminal in nature.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

plaintiffs have sufficiently alleged such a right.

**i.   Legal Framework – The "Special Needs" Exception to the Warrant Requirement**

The Fourth Amendment to the Constitution protects against "unreasonable" searches and seizures.  U.S. CONST. amend. IV.  To be reasonable, a search generally must be supported by a warrant issued upon probable cause.  *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665 (1989).  But, there are exceptions to this general rule.  *City of Charleston v. Ferguson*, 532 U.S. 67, 81 n.15 (2001).  One such exception applies when a search serves "special governmental needs" beyond the normal needs of law enforcement; in which case the search may be reasonable despite the absence of a warrant, probable cause, or even individualized suspicion. *Von Raab*, 489 U.S. at 666; *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 624 (1989). Accordingly, an agency may subject federal employees engaged in certain sensitive tasks – such as carrying a firearm – to suspicionless "special needs" urinalysis testing.[6]  *Hartness v. Bush*, 919 F.2d 170, 172 (D.C. Cir. 1990); *Von Raab*, 489 U.S. at 679; *Skinner*, 489 U.S. at 624;

A critical factor in the validity of suspicionless testing is the non-law enforcement nature of the special need asserted as justification.  *Ferguson*, 532 U.S. at 79; *New Jersey v. T.L.O.*, 469 U.S. 351 (1985) (Blackmun, J., concurring) (stating that an agency may invoke the "special needs" exception "in those exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable").  In *Ferguson*, the Supreme Court reviewed its "special needs" cases, emphasizing that in each case, the justification underlying the search was "divorced from the State's general interest in law

---

[6]     Government-compelled urinalysis is a search for purposes of the Fourth Amendment, and therefore must be reasonable.  *Stigile v. Clinton*, 110 F.3d 801, 803 (D.C. Cir. 1997); *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 109 S. Ct. 1402, 1413 (1989) (stating that urine tests "intrude[] upon expectations of privacy that society has long recognized as reasonable").

enforcement," with each search having no law enforcement purpose and little, if any, entanglement with law enforcement. *Ferguson*, 532 U.S. at 79-80, 81 n.15. The Court noted that in the context of special needs, it had never "upheld the collection of evidence for criminal law enforcement purposes." *Id.* at 84 n.20. Accordingly, it concluded that the "special needs" doctrine was inapplicable in a patient-testing case in which the testing results were turned over to police because the testing was undertaken "for the specific purpose of incriminating" the patients. *Id.* at 1292; *see also id.* at 1299 (Scalia, J., dissenting). This line of precedent makes clear that the Fourth Amendment protects against the use of suspicionless drug testing procedures undertaken for the specific purpose of gathering evidence for criminal proceedings. *Id.*

### ii. The Search Conducted in this Case Fails the "Special Needs" Framework

This case, however, differs from the cases cited above in that the government did not undertake the drug testing for the specific purpose of gathering evidence for a criminal proceeding. Rather, the plaintiffs were randomly selected for the drug testing under the EPA's DFWP, and as previously discussed, the EPA's DFWP constitutes a valid special needs search.

In determining whether a search is valid under the "special needs" exception, the court must conduct a balancing test that weighs (a) the intrusion on the individual's privacy interest against (b) the "special needs" of the government that supported the program. *Ferguson*, 532 U.S. at 78. In conducting this balancing, the court concludes that by incorporating a law enforcement purpose, the defendants increased the intrusion to the plaintiffs' privacy interests while simultaneously decreasing the governmental need in conducting the "special needs" search.

### (a) Nature of the Intrusion on the Plaintiffs' Privacy Interest

By initiating a criminal investigation into plaintiff Fairchild's alleged wrongdoing, the defendants increased the nature of the intrusion on the plaintiffs' privacy interests. The

intrusiveness of a search is determined, in part, by considering the audience of the test results.

*See Ferguson*, 532 U.S. at 78 (holding that a component of the expectation of privacy for hospital

patients is that their test results "will not be shared with nonmedical personnel without [their]

consent").  Whereas the results of the EPA's DFWP drug test are typically shown to EPA

personnel only, Defs.' Mot. Wallace Decl. ¶¶ 7, 8, 9, 11, in this case, the defendants shared the

plaintiffs' drug test results with an AUSA.  This added audience, particularly an audience whose

primary purpose in viewing the results is to determine whether to initiate criminal proceedings,

increases the invasion of the plaintiffs' privacy.  *See Ferguson*, 532 U.S. at 78 (noting the

increased intrusion on privacy when test results are disseminated to third parties) (citing *Skinner*,

489 U.S. 602, *Von Raab*, 489 U.S. 656, *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646 (1995),

and *Chandler v. Miller*, 520 U.S. 305 (1997)).

**(b)   Governmental Need in Conducting the "Special Needs" Search**

Through its criminal investigation, the defendants also diminished the "special need"

justifying the search in two critical ways.  First, as the Supreme Court made clear in each case in

which the Court upheld the "special need" justifying the search, "the 'special need' that was

advanced as a justification for the absence of a warrant or individualized suspicion was one

divorced from the State's general interest in law enforcement." *Ferguson*, 532 U.S. at 79.

However, unlike the facts presented in *Ferguson*, in which the purpose of the "special need" fell

under scrutiny for its law enforcement purpose, in this case the parties concede that the agency's

"special need" is divorced from the State's law enforcement interest.

The defendants make much of this distinction, noting the constitutionality of the DFWP.[7]

Defs.' Mot. at 25 (citing *Edmund v. Goldsmith*, 193 F.3d 659, 664 (7th Cir. 1999)).  To the

defendants, "'the special need' distinct from law enforcement that permitted the testing of these

employees did not somehow evaporate merely because Ms. Fairchild sought to circumvent the

test." Defs.' Opp'n at 19.  The defendants are correct to a point.  Because the search was

scheduled as part of the EPA's DWFP, it has, and will always have, some vestige of its original

purpose.  However, a subsequently launched criminal investigation, regardless of its cause (here

plaintiff Fairchild's alleged malfeasance), certainly complicates the equation.  *See Ferguson*, 532

U.S. at 79.

In distinguishing between the "ultimate goal of the program" and the "immediate

objective of the search[]," the Supreme Court stated that

> because law enforcement involvement always serves some broader social purpose or
> objective . . . virtually any nonconsensual suspicionless search could be immunized
> under the special needs doctrine by defining the search solely in terms of its ultimate,
> rather than immediate, purpose.  Such an approach is inconsistent with the Fourth
> Amendment.

*Id.* at 84 n.20.

Because a "special needs" search is permissible only if it is executed for a purpose

"beyond the normal need for law enforcement," the infusion of a law enforcement need

---

[7]     The defendants go so far as to suggest that plaintiff Fairchild's conduct "provided
*additional* constitutionally permissible grounds for her tests."  Defs.' Mot. at 25-26
(emphasis in original).  While Fairchild's conduct may constitute an independent
justification for obtaining a warrant for a drug test, it does not, on its own, create a
constitutionally permissible grounds for a suspicionless test.  By not seeking a search
warrant, the defendants failed to test Fairchild's conduct consistent with the Fourth
Amendment.  *See Johnson v. United States*, 333 U.S. 10 (1948) (holding that the Fourth
Amendment requires that probable cause must be determined by a neutral and detached
magistrate judge rather than "the officer engaged in the often competitive enterprise of
ferreting out crime").

undermines its constitutionality.[8]  *T.L.O.*, 469 U.S. at 351 (Blackmun, J., concurring).  "The fact that positive test results were turned over to the police does not merely provide a basis for distinguishing prior cases applying the 'special needs' balancing approach to the determination of drug use.  It also provides an affirmative reason for enforcing the strictures of the Fourth Amendment."  *Ferguson*, 532 U.S. at 54.

Second, the "special needs" exception constitutes a "closely guarded" vehicle around the Fourth Amendment's warrant requirement.  *Ferguson*, 532 U.S. at 84.  Its use is strictly limited to instances in which "the warrant and probable-cause requirement [is] impracticable."  *T.L.O.*, 469 U.S. at 351.  Through the investigation of the allegations levied against the plaintiffs and with the involvement of the AUSA, the EPA opened a clear and highly preferred avenue for government searches – by obtaining a warrant based on probable cause.  Because the defendants could have sought a warrant for the drug test, the agency drug test no longer constituted an "exceptional circumstance[] in which the special needs, beyond normal need for law enforcement, make the warrant and probable-cause requirement impracticable."  *Id.*  For this reason, the government's "special need" sheds its special character.

---

[8]    As the plaintiffs eloquently note, "the special needs exception to the warrant requirement does not operate as a constitutional one-way street that, once entered, leaves the Fourth Amendment irrevocably behind."  Pls.' Reply at 4.  This view is consistent with Supreme Court precedent declaring that reasonableness "depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself."  *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985); *Walter v. United States*, 447 U.S. 649, 656 (1980) (stating that "the scope of the search is limited by the terms of its authorization" and holding that because a subsequent official investigation and search of a package exceeded the scope of the original search, the Fourth Amendment required an independent justification).  Thus, a constitutional authorization to conduct a search (whether through a warrant or a "special need") exists so long as the scope or rationale of that search remains materially unchanged.  Because the scope and rationale for the searches conducted in this case changed through the infusion of a law enforcement purpose, so too did the limitations placed upon the government by the Fourth Amendment.

### b.    The Defendants are Entitled to Qualified Immunity

Having found that the plaintiffs have alleged a constitutional violation, the court proceeds

to the second prong under *Bivens*.  In so doing, the court must consider whether the right

allegedly violated was clearly established at the time of the defendants' actions.  *Butera*, 235

F.3d at 646.  As the plaintiffs concede, the EPA's DFWP program is a valid "special needs"

exception.  Material to this case, therefore, is whether the law was well settled that the addition

of a law enforcement purpose to an otherwise lawfully constituted agency search violates the

Fourth Amendment.  The court concludes that it was not.

In cases dealing with the constitutionality of an administrative search under the "special

needs" exception, courts focus on the purpose underlying the administrative search.  *Ferguson*,

532 U.S. at 78 (evaluating the "'special needs' that supported the program"); *Skinner,* 489 U.S.

602, 109 S. Ct. at 1415.  Though the law at the time of the defendants' conduct, from fall 1999 to

spring 2000, clearly established that testing procedures were valid only if they protected against

the release to third parties, *Ferguson*, 532 U.S. at 78 n.12 (citing *Skinner*, 489 U.S. 602, *Von*

*Raab*, 489 U.S. 656,  *Acton*, 515 U.S. 646, and *Chandler*, 520 U.S. 305), they did not answer the

question posed here.  And though "officials can still be on notice that their conduct violates

established law even in novel factual circumstances," *Hope v. Pelzer*, 536 U.S. 730, 741 (2002),

here, the defendants, through precedent, were on notice that the EPA's DFWP was constitutional.

Operating in accordance with the established agency procedures for administering a

constitutionally valid "special needs" search, these defendant government workers cannot be

tasked with recognizing that intervening factors contain hidden, and at the time unexpounded,

constitutional roadblocks.[9]  Accordingly, the plaintiffs' Fourth Amendment right was not clearly

established, *Butera*, 235 F.3d at 646, and these defendants are entitled to qualified immunity.


## IV.    CONCLUSION

For the foregoing reasons, the court grants the defendants' motion for summary judgment

and denies the plaintiffs' motion for partial summary judgment.  An order directing the parties in

a manner consistent with this Memorandum Opinion is separately and contemporaneously issued

this 3rd day of March, 2006.


RICARDO M. URBINA
United States District Judge

---

[9]    This is particularly true when, as here, the constitutionality of the search is determined
through a balancing test.  *Ferguson*, 532 U.S. at 78.  Prior to this court's ruling, the
individual defendants would have no reason to believe that the constitutionality of their
"special needs" test evaporated through the plaintiffs' alleged malfeasance.  Going
forward, however, government actors may be well advised to take pause in pressing
forward with a "special needs" search despite the existence of subsequent intervening
factors.